1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                      FOR THE DISTRICT OF OREGON

11                          PORTLAND DIVISION

12   SHANE A. COSTA,                )
                                    )
13               Plaintiff,         )
                                    )    No.  CV-09-6048-HU
14        v.                        )
                                    )
15   MICHAEL J. ASTRUE,             )
     Commissioner of Social         )    OPINION & ORDER
16   Security,                      )
                                    )
17               Defendant.         )
     ───────────────────────────────)
18
     Drew L. Johnson
19   DREW L. JOHNSON, P.C.
     1700 Valley River Drive
20   Eugene, Oregon 97401

21   Linda S. Ziskin
     P.O. Box 2237
22   Lake Oswego, Oregon 97035

23        Attorneys for Plaintiff

24   Dwight C. Holton
     UNITED STATES ATTORNEY
25   District of Oregon
     Adrian L. Brown
26   ASSISTANT UNITED STATES ATTORNEY
     1000 S.W. Third Avenue, Suite 600
27   Portland, Oregon 97204-2902

28   / / /


     1 - OPINION & ORDER

Kathryn A. Miller
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

    Attorneys for Defendant

HUBEL, Magistrate Judge:

    Plaintiff Shane Costs brings this action for judicial review of the Commissioner's final decision to deny Supplemental Security Income (SSI). This Court has jurisdiction under 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). Both parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c). I reverse the Commissioner's decision and remand for additional proceedings.

PROCEDURAL BACKGROUND

    Plaintiff applied for SSI on April 6, 2004, alleging an onset date of November 1, 1997.[1] Tr. 78-80. His application was denied initially and on reconsideration. Tr. 36-38, 40-42.

    On September 19, 2007, plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ).[2] Tr. 308-46.

_____

    [1] Plaintiff filed a prior SSI application on October 10, 2002, and was found not disabled by a different ALJ in a March 17, 2004 decision. Tr. 362-72. After the Appeals Council denied his request for review, plaintiff took no further action regarding that application. Tr. 18.

    [2] Plaintiff's first hearing date was December 11, 2006, but he was granted a continuance to find an attorney. Tr. 294. He appeared at the next hearing date on April 11, 2007, with counsel, but the hearing was again continued due to the fact that counsel had received the file only the previous night. Tr. 301-07.

2 - OPINION & ORDER

On October 26, 2007, the ALJ found plaintiff not disabled.  Tr. 1515-29.  The Appeals Council denied plaintiff's request for review of the ALJ's decision.  Tr. 6-10.

FACTUAL BACKGROUND

Plaintiff alleges disability based on bi-polar disorder, eating disorder, spinal pain, agoraphobia, and anxiety.  Tr. 106. At the time of the September 19, 2007 hearing, plaintiff was forty-two years old.  Tr. 311.  Plaintiff has a GED.  Id.  Plaintiff has past relevant work as a kitchen helper.  Tr. 28.

I.  Medical Evidence

On April 30, 2004, a few weeks after he filed his second SSI application, plaintiff underwent a psychological evaluation by psychologist Joseph Balsamo, Psy. D.  Tr. 188-93.  In addition to an interview, Dr. Balsamo administered the following tests:  (1) Wechsler Adult Intelligence Test - III (WAIS-III); (2) Psychological Assessment Inventory (PAI), (3) Rey-Osterrieth Complex Figure Test, Trials A and B; and (4) a mental status exam. Tr. 188.

Plaintiff's mental status exam was normal.  Tr. 190.  However, he was agitated and restless during the interview, made several unnecessary verbalizations, and often complained that he had "been through this before" and just wanted help.  Id.  The WAIS-III measures current intellectual functioning.  Id.  Plaintiff seemed resistant to taking the test and was somewhat uncooperative.  Id. He struggled on items and frequently gave up without trying to solve the problem.  Id.  Plaintiff's full scale IQ was an "extremely low" 66.  Tr. 191.  His verbal IQ was 84, indicative of borderline intellectual functioning.  Id.  His performance IQ was

3 - OPINION & ORDER

1  63, also an extremely low score.  Id.

2      Dr. Balsamo explained that the scores indicated difficulty in
3  cognitive thought and understanding as well as a "very slow
4  processing speed."  Id.; Tr. 192 (completion time on "Trails A and
5  B" also showed slow processing speed).  He noted that the previous
6  WAIS given in March 2001, by Dr. Charlotte Higgins-Lee, Ph.D.,
7  showed an overall IQ Of 74.  Id.; see also Supp'l Tr. 469-77 (March
8  23, 2001 report by Dr. Higgins-Lee).  Thus, the present scores
9  showed a marked decrease in intellectual functioning in the last
10  three years.  Id.

11      But, Dr. Balsamo also noted that given that the PAI indicated
12  that plaintiff scored high on negative impression management, a
13  validity test designed to determine the presence of malingering, it
14  is "likely that Costa was deliberately trying to portray himself in
15  a negative way to get services that he otherwise may not be
16  qualified for."  Id.  According to Dr. Balsamo, "[t]his may also be
17  a pervasive pattern on the other tests indicating that he was worse
18  off that [sic] he actually is.  His decline in his WAIS from the
19  last time may be due to mental deterioration or from intentional
20  manipulation of the test."  Id.

21      Nonetheless, Dr. Balsamo thought the test indicated that there
22  were several areas in which plaintiff may be legitimately
23  experiencing severe emotional and psychological issues.  Id.  As
24  Dr. Balsamo explained, "[t]he PAI indicated the presence of
25  multiple diagnoses given that he may have been trying to exaggerate
26  his symptoms, however, it is likely that the majority of problems
27  that he is experiencing are likely to have some validity."  Id.  He
28  stated:

4 - OPINION & ORDER

1
2   The main problems, which are supported by his clinical
    interview, are suspiciousness and failures in close
3   relationships.    He exhibits severe thinking and
    concentration problems such that he may suffer from a
    thought disorder. This was evident in the administration
4   of the WAIS as his attention wandered during tasks. He
    also exhibits hostility, resentment and suspiciousness.
5   This was evident in both his clinical interview and in
    his family history. He is also socially withdrawn and
6   has problems relating to friends and family as confirmed
    by his history of homelessness and his problems with his
    stepfather.
7
8   He may experience psychotic features, which are
    characterized by an active psychotic episode with
9   hallucinations or delusional beliefs although he did not
    report experiencing hallucinations.    The PAI and his
10  clinical interview also indicate a severe problem with
    depression and anxiety and the presence of suicidal
11  ideation.    It is likely that he has experienced a
    traumatic event such as abuse (physical or sexual) but he
12  did not report events that could verify this. His mood
    is liable [sic] and he has frequent and severe mood
13  swings, which could explain his violent outbursts in the
    past.

14  Id.

15  Dr. Balsamo's diagnostic impressions were Axis I diagnoses of

16  Bi-polar II Disorder and Cognitive Disorder, NOS, and Axis II

17  diagnoses of R/O Borderline Personality Disorder and Borderline

18  Intellectual Functioning.    Tr. 192.    He noted in the conclusion

19  section of his report that plaintiff appeared to have problems with

20  severe depression, anxiety, and hostility.    Id.  He had few social

21  skills, was socially isolated, may have problems thinking and

22  concentrating, and may have a thought or psychotic disorder.    Id.

23  He reported that plaintiff's psychiatric diagnoses were for bi-

24  polar disorder, characterized by cycling between a depressive state

25  and hypomania, and an agitated state, which usually follows a

26  depression episode.    Id.  Given the results of the WAIS-III and

27  other tests, Dr. Balsamo opined that plaintiff most likely suffered

28  from a cognitive disorder.    Id.  He concluded that plaintiff's

5 - OPINION & ORDER

"intellectual functioning along with the psychiatric symptoms make it likely that he will never be able to maintain gainful employment, as even the tasks of low skilled labor are probably too much of a cognitive strain for him." Id. Additionally, Dr. Balsamo noted, plaintiff's "violent temper and labile emotional state make it likely that he may pose a danger to others in a structured work setting." Id. He assessed plaintiff's Global Assessment of Functioning (GAF) score as 45. Id.

Disability Determination Services (DDS) psychologist Paul Rethinger, Ph.D., completed a mental residual functional capacity (RFC) form on July 14, 2004. Tr. 198-201. He found plaintiff moderately limited in the following abilities: (1) to understand and remember detailed instructions; (2) to sustain an ordinary routine without special supervision; (3) to work in coordination with or proximity to others without being distracted by them; (4) to interact appropriately with the general public; (5) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (6) to be aware of normal hazards and take appropriate precautions; and (7) to set realistic goals or make plans independently of others. Tr. 198-99.

Also on July 14, 2004, Dr. Rethinger completed a Psychiatric Review Technique Form (PRTF) in which he indicated that plaintiff had a drug induced mood disorder, a personality disorder with narcissistic histrionic and borderline features, and polysubstance abuse. Tr. 202-10. In the accompanying functional limitation ratings, Dr. Rethinger assessed plaintiff as having mild restrictions of activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining

6 - OPINION & ORDER

concentration, persistence, and pace, "exclusive of DA&A [drug abuse and alcoholism]." Tr. 212. Dr. Rethinger assessed plaintiff as having moderate restrictions of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, and pace, "inclusive of DA&A." Id.

On September 17, 2004, clinical psychologist Nina Dominy, Ph.D., of the Linn County Department of Health Services, wrote a letter supporting plaintiff's disability claim. Tr. 218-19. The letter noted that plaintiff had been treated at Linn County Mental Health from September 2002 to February 2003. Tr. 218. During that time, he was diagnosed with major depressive disorder and rule out bipolar disorder. Id. He displayed the following symptoms: anaerobia (loss of interest in almost all activities), appetite disturbance (noting his weight of 148 pounds and his height of 6'5"), daily insomnia, fatigue, feelings of worthlessness, diminished ability to think or concentrate, recurrent thoughts of death or suicidal ideation, and social anxiety or panic attacks. Id.

Dr. Dominy stated that plaintiff had displayed a history of one or more years of the inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Tr. 219. She noted that he had lived in homeless shelters, roamed the streets, or lived in a small metal structure on his grandmother's property. Id. Dr. Dominy noted that during his treatment at Linn County Mental Health, plaintiff displayed documented use of alcohol and drugs. Id. It was her opinion, however, that the drugs and alcohol were not a causal

7 - OPINION & ORDER

factor in his mental illness, but were instead an attempt to "self medicate" as a way to relieve his mental anguish. Id. Dr. Dominy noted that plaintiff made progress with consistent therapy, but services were discontinued in February 2003 due to the termination of his medical insurance. Id.

Finally, Dr. Dominy stated that she was not currently seeing plaintiff as a patient. Id. But, she noted that plaintiff's family members were expressing serious concerns about him to her and that she would be surprised if he were not deteriorating without access to treatment. Id. She urged defendant to reconsider plaintiff's condition and noted that his documented inability to function effectively in society was supported by several medical staff as well as herself. Id. She concluded by stating that plaintiff was suffering from a severe mental illness and required immediate psychiatric treatment and attention to his needs. Id.

On November 18, 2004, plaintiff underwent an evaluation by psychiatrist Dr. Gale Smolen, M.D. Tr. 222-27. In addition to an interview with plaintiff, who was accompanied by his mother, the information Dr. Smolen had available included (1) a "Development Summary Workshop" (no date given); (2) a 2003 decision by the Social Security Administration Office of Hearing and Appeals; (3) notes from Sharon DeHart, PAC dated July 15, 2003; (4) Dr. Balsamo's April 30, 2004 psychological evaluation; (5) notes from Linn County Mental Health dated April 1, 2002 through February 28, 2003; and (6) a note from David Ogle, M.D., dated April 21, 1999. Tr. 222.

In the section regarding plaintiff's education, Dr. Smolen

8 - OPINION & ORDER

1  remarked on the WAIS-III scores obtained by Dr. Balsamo. Id. Dr.
2  Smolen considered those results "highly suspect" based on Dr.
3  Balsamo's report that while taking the test, "plaintiff struggled
4  on items and frequently gave up without trying to solve the
5  problem." Id. She also noted plaintiff's previous WAIS-III scores
6  from March 2001 which indicated his overall IQ was 74, his verbal
7  IQ was 80, and his performance IQ was 70.   Id.

8      Plaintiff reported that he had started taking
9  Remeron/mirtazapine, an antidepressant medication, the previous
10 week.   Tr. 223.   He also reported having been on lots of
11 medications in the past, but stated that Klonopin/clonazepam, a
12 medication used to treat panic attacks, and Ativan/lorazepam, an
13 anti-anxiety medication, worked the best for him.   Id.

14     In the section describing plaintiff's mental illness, Dr.
15 Smolen refers to the "excellent mental health history" available in
16 the documents from ALJ Stewart, who adjudicated plaintiff's
17 previous SSI claim.   Id.   Dr. Smolen then recited much of
18 plaintiff's history herself including prior treatment at Linn
19 County Mental Health in 2002, his eight days in the Salem Hospital
20 Psychiatric Unit in 2001, followed by a three-day stay in 2002, and
21 his psychological dependence on Klonopin noted in 2003.   Id.

22     In the section on substance abuse, Dr. Smolen noted that
23 plaintiff reported that he never had a problem with alcohol and
24 never had a problem with illegal drugs.   Tr. 2224.   She wrote that
25 records indicated he was not telling her the truth.   Id.   She noted
26 a report in 2001 by Dr. Oxenhandler that he was addicted to
27 marijuana, Dr. Higgins-Lee's report that he smoked marijuana
28 regularly, and notes from Salem Hospital in September 2002 in which

9 - OPINION & ORDER

plaintiff described himself as a binge drinker and said he used whatever drugs he could get his hands on, including methamphetamines, uppers, downers, and quaaludes. Id. She also noted a report from Dr. Robert Vandiver, M.D., of Linn County Mental Health on September 26, 2002, when plaintiff stated he had been drinking and "ate a morphine pill." Id.

Plaintiff told Dr. Smolen that he had been homeless and lived at a mission, but was presently living on his mother's property in a small trailer with no cooking or bathroom facilities. Tr. 223, 224. He has a driver's license and a vehicle. Tr. 224. He tries to shower regularly, but sometimes does not care. Id. He does not do a substantial amount of housework and does not do his own cooking except to heat soup. Id. Dr. Smolen wrote that plaintiff "does not do anything on a regular basis." Id. He used the phone, "sometimes," if he wasn't too depressed. Id. He had no cash source of income, but did receive food stamps and recently obtained an Oregon Health Plan card. Id. His mother generally does all of his shopping. Id.

Plaintiff weighed between 150 and 160 pounds at the time, and stood 6'5". Id. He reported being depressed a lot, hardly leaving his house, and sometimes getting frustrated and angry. Id. He eats one meal a day on a good day, and none on a bad day. Id. His concentration depends on his state of mind. Id. He reported that his energy level is way down and never gets up to where he feels content. Tr. 225. He does not go out for weeks at a time. He has panic attacks that vary. Id. He indicated he felt better on medication. Id.

In the diagnosis section, Dr. Smolen listed plaintiff's Axis

10 - OPINION & ORDER

I diagnoses as "polysubstance dependence with marijuana and alcohol being mentioned the most, highly suspected," and "malingering, suspected." Id.  Her Axis II diagnoses were rule out personality disorder nos with narcissistic and borderline traits.  Id.  Her GAF score was listed as "50???"  Id.

Dr. Smolen explained that, she believed, looking at all the evidence, and including the fact that plaintiff denied in his interview ever having a problem with alcohol and illegal drugs, that there was strong possibility that plaintiff was malingering. Id.  She thought he might have some degree of depression which responded well to antidepressants.  Id.  She thought that the diagnosis of personality disorder nos with narcissistic and borderline traits, which she stated came from Salem Hospital, seemed to be the best diagnosis and most fitting plaintiff.  Id. She opined that plaintiff would be able to remember and understand with mild difficulty.  Tr. 226.  She found his concentration only mildly impaired.  Id.  She stated that with his present attitude, he would probably not be able to relate well to people, but he probably could relate to people if he wanted to.  Id.

DDS psychologist Robert Henry, Ph.D, completed a mental RFC and a PRTF on November 22, 2004.  Tr. 228-31, 233-44.  In the mental RFC, he assessed plaintiff as being moderately limited in the following abilities:  (1) to understand and remember detailed instructions;  (2) to carry out detailed instructions;  (3) to maintain attention and concentration for extended periods; and (4) to interact appropriately with the general public.  Tr. 228-29.  In the summary section, he noted that plaintiff was "able to maintain concentration and attention for simple 1,2, step tasks duties, but

11 - OPINION & ORDER

would be unable to for more detailed, complex work assignments." Tr. 230.  He also stated that while plaintiff was restricted from working with the public, he was capable of interacting appropriately with supervisors and coworkers.  Id.

In the PRTF, Dr. Henry noted that plaintiff had a drug induced mood disorder, a personality disorder with narcissistic and borderline features, and polysubstance dependence.  Tr. 236, 240, 241.  He found that plaintiff had a moderate degree of limitation in maintaining social functioning, and mild limitations in activities of daily living and maintaining concentration, persistence, and pace.  Tr. 243.

On July 31, 2006, plaintiff was screened by mental health specialist Samara Wiley of Linn County Mental Health.  Tr. 267. Plaintiff reported to Wiley that he was tired of feeling "this way, anxiety, anger, frustrated, can't eat, not sleeping well, lonely, depressed."  Id.  He noted that previously, he had been stable with therapy and medications at Linn County Mental Health for a couple of years, but he lost his Oregon Health Plan coverage in 2003 and had been doing very "badly" since that time.  Id.  Wiley noted that plaintiff was tearful, focused, mostly appropriate, agitated, depressed, and appeared to have average intelligence and good memory, both recent and remote.  Id.

Dr. Vandiver, of Linn County Mental Health, performed a psychiatric assessment of plaintiff on August 22, 2006.  Tr. 264-66.  Plaintiff spoke of his depression, difficulty falling asleep, and being irritable.  Tr. 264.  Plaintiff cried easily, complained of ruminating a lot, and requested that he be put back on the treatment he previously received which he indicated was effective.

12 - OPINION & ORDER

1   <u>Id.</u>  Plaintiff reported problems with his teeth falling out, but
2   otherwise, felt he was fairly healthy physically.  Tr. 265.  He
3   told Dr. Vandiver that he had an eating disorder, but Dr. Vandiver
4   had never heard of the one plaintiff named.  <u>Id.</u>

5       In  discussing  his  drug  and  alcohol  history,  plaintiff
6   equivocated a bit before finally admitting to previously using a
7   lot of street drugs and doing them in various combinations.  <u>Id.</u>
8   He also reported having stopped doing these years ago.  <u>Id.</u>  He
9   denied  having  a  problem  with  alcohol  and  stated  that  he
10  occasionally has a glass of beer.  <u>Id.</u>

11      Dr. Vandiver noted that plaintiff's speech was rapid, but that
12  his thought processes were coherent, focused, and relevant.  <u>Id.</u>
13  His seemed to abstract information well, his judgment and insight
14  appeared intact, and his intelligence was at least average.  <u>Id.</u>

15      Dr.  Vandiver's  Axis  I  diagnosis  was  major  depression,
16  recurrent and moderate in intensity.  <u>Id.</u>  He assessed plaintiff's
17  GAF as 54.   Tr. 266.   He stated that plaintiff presented with
18  complaints of major depression with an anxious component. Tr. 266.
19  Dr. Vandiver noted that while plaintiff reported that his treatment
20  in the past of taking Klonopin and Remeron was effective, Dr.
21  Vandiver had trouble with the fact that plaintiff had a strong
22  tendency to be "philosophical in all his answers" rather than
23  telling Dr. Vandiver how he was feeling.  <u>Id.</u>  This made Dr.
24  Vandiver "mildly suspicious that there is a bit of factitious
25  disorder  here,  in  particular,  a  campaign  to  try  and  get
26  disability."  <u>Id.</u>  However, Dr. Vandiver stated, it would easily
27  just be plaintiff's personality style and Dr. Vandiver could be
28  wrong about his supposition.  <u>Id.</u> Dr. Vandiver also thought it was

13 - OPINION & ORDER

1  unusual that there was "not more substance abuse going on."  Id.

2  Again, however, he noted that this may be his suspiciousness at

3  work.  Id.

4       Dr. Vandiver concluded it was reasonable to restart treatment,

5  providing plaintiff could afford it.  Id.  But, he wanted to avoid

6  substances that were potentially abusable, like Klonopin, and

7  consequently, he started plaintiff on Remeron, with instructions to

8  take one-half of a thirty milligram pill at night, and then work up

9  to a full pill in about one week.  Id.  Dr. Vandiver was to see

10 plaintiff again in about one month.  Id.

11      In an initial assessment by Wiley on August 22, 2006,

12 plaintiff appeared anxious and depressed and reported he was

13 homeless.  Tr. 259.  In a checklist type form, she noted that he

14 was unkempt and disheveled, but was cooperative, with primarily

15 appropriate affect.  Id.  She also checked boxes indicating poor

16 personal hygiene and self care, underweight, average intellect,

17 depressed, tearful, anxious, rambling speech, rapid and pressured

18 speech, and normal and paranoid thought processes.  Id.  Additional

19 boxes checked were for normal behavior, but also restless and

20 agitated, oriented to time, place, person and purpose, and fair

21 insight.  Tr. 260.  Her Axis I diagnosis was of a major depressive

22 disorder, recurrent, moderate, with possible psychotic features,

23 with a current GAF of 45.  Id.

24      Plaintiff reported to Wiley that he had a medical marijuana

25 card and that the marijuana improved his appetite and decreased his

26 anxiety.  Tr. 261.  He reported poor appetite, denying himself

27 food, being mistrustful of other people, not sleeping, and not

28 taking care of himself.  Id.  He reported past use of

14 - OPINION & ORDER

methamphetamines, but stated that currently, he had no doctor or medications beside what he was recently prescribed by Dr. Vandiver, and the medical marijuana. Id. Wiley noted that because plaintiff had a medical marijuana card and did not use other substances, she was not going to address drug dependence in her treatment. Id.

On September 5, 2006, plaintiff and Wiley both signed a mental health treatment plan that included the goal of improving the quality and stability of plaintiff's mood by attending regular therapy appointments and attending scheduled psychiatric evaluations and medical monitoring appointments. Tr. 258.

Plaintiff saw Dr. Vandiver again on September 15, 2006. Tr. 257. Plaintiff reported that the Remeron was helping, but that he had some recent stressors making things difficult for him lately. Id. In particular, someone had recently broken into his pickup truck and stolen many of his possessions, including his fishing pole. Id. Dr. Vandiver noted that plaintiff liked to go fishing a lot and it was his main activity for amusement and maybe food. Id. Plaintiff was discouraged. Id.

Plaintiff appeared somewhat animated with rapid speech and body language. Id. Dr. Vandiver noted the need to rule out hypomania. Id. For the present, Dr. Vandiver planned to continue plaintiff's current treatment, but he also noted that he should consider the possibility that plaintiff actually had a bipolar mood disorder. Id. He planned to see plaintiff again in twelve weeks. Id.

The next record from Linn County Mental Health is dated February 6, 2007. Tr. 254. On that date, Dr. Vandiver appears to have spoken with Dr. Lance Large, who is noted to be plaintiff's

15 - OPINION & ORDER

1  primary care provider, about transferring plaintiff's medications
2  to Dr. Large.  Id.

3      On February 20, 2007, Wiley completed a discharge summary
4  which indicated that plaintiff's last date of billable service and
5  contact was February 6, 2007.  Tr. 250.  The termination type was
6  noted to be "client termination w/o clinic agreement (i.e., client
7  left w/o explanation).  Id.  His GAF at discharge was rated as 40.
8  Id.  Wiley noted that while plaintiff initially engaged with
9  treatment, he then discontinued follow through with appointments
10 and did not reschedule or respond to a letter sent to him.  Tr.
11 251.  His medications were transferred to his primary care
12 provider.  Id.  She believed his prognosis was poor based on his
13 lack of follow through and the family's input regarding his recent
14 behaviors at home.  Id.  In a final checklist form, Wiley noted
15 that plaintiff was unable to work based on physical or
16 psychological reasons, and that he was involved with the criminal
17 justice system during his course of treatment.  Tr. 252.

18     On June 27, 2007, plaintiff was seen by Dr. Daniel Hoagland,
19 M.D., at Sweet Home Family Medicine, for complaints of abdominal
20 pain persisting for several months.  Tr. 273.  Dr. Hoagland noted
21 that plaintiff's symptoms were "fairly nondescript," and he thought
22 it could be lactose intolerance.  Id.  He ordered various blood
23 tests, and tested for other organisms such as giardia.  Id.  He
24 told plaintiff to try a lactose free diet for one week, and return
25 to the clinic in two weeks.  Id.

26     At his next visit, on July 10, 2007, plaintiff reported that
27 the lactose free diet was not particularly helpful.  Tr. 271.
28 Plaintiff also reported pain in his back for the prior four days.

16 - OPINION & ORDER

<u>Id.</u>  He told Dr. Hoagland that he had had back spasms frequently in the past.  <u>Id.</u>  On physical examination, plaintiff's back showed some mild low lumbar spinous process tenderness and definite left paraspinous lumbar spasm.  <u>Id.</u>  However, a straight leg raise test was negative and plaintiff's motor sensory was intact in his lower extremities.  <u>Id.</u>

For his continued abdominal pain, Dr. Hoagland prescribed Zantac/ranitidine, used to treat ulcers and gastroesophageal reflux disease.  <u>Id.</u>  For his back pain, he prescribed Salsalate, a non-steroidal anti-inflammatory drug, and Flexeril, a muscle relaxant, and advised plaintiff to apply heat and to stretch.  <u>Id.</u>  On July 24, 2007, plaintiff reported that the ranitidine had helped his abdominal pain considerably, although he still had some heartburn in the morning.  Tr. 259.  He also reported that his back pain was much better.  <u>Id.</u>  He was not having spasms, but he still had some pain when he did too much.  <u>Id.</u>

Dr. Hoagland indicated that based on plaintiff's response to the ranitidine, plaintiff's complaints of abdominal pain were almost certainly peptic related.  <u>Id.</u>  He substituted over-the-counter Prilosec/omeprazole for the ranitidine, instructing plaintiff to take twenty milligrams daily for two to three months and then discontinue "if tolerating."  <u>Id.</u>  For plaintiff's back, he urged plaintiff to walk and stretch and noted that plaintiff could use medications on an as-needed basis.  <u>Id.</u>

II.  Plaintiff's Testimony

Plaintiff gave testimony regarding his depression, back pain, eating disorder, use of medical marijuana, and his activities.  As to his depression, plaintiff said he was too depressed to look for

17 - OPINION & ORDER

work, but that he had not taken medication for depression for the prior five months due to stomach problems. Tr. 315-16. He stated that his depression had been severe since 2004, that he has suicidal thoughts all the time, and that lately he has been "real bad." Tr. 316-19. Plaintiff testified that he gets to a point where he does not care too much, and then does not eat. Tr. 319. He does not take care of himself because he is so "down spirited." Id.

He described that his eating disorder, noted in the transcript as "gloxmia," is part of his depression which is a form of self-destruction. Tr. 329-30. He explained that it was not directly suicidal, but he just does not care enough to eat. Tr. 330. Some days he does not eat at all and other days he forces himself to eat a sandwich. Id.

As for his back pain, plaintiff stated that he was taking "60 pain pills" and "30 Flexeril" each month for severe back pain. Tr. 315. He claims that Dr. Hoagland put him on these medications. Id.; Tr. 324. His back makes it so he "can't do much of anything." Tr. 324. He stated that he has had this "condition" of suffering back pain on and off, since he was twenty years old. Id. Plaintiff testified that a couple of hours of bending over puling weeds or hoeing in the yard causes muscle spasms in his back. Id. Plaintiff stated that his doctor told him to walk, but he cannot walk more than one mile without taking a break. Tr. 327. He estimated that lifting anywhere between twenty-five and forty pounds can trigger spasms. Tr. 328.

Plaintiff testified that he had been clean of illegal drug use for three years. Tr. 315; see also Tr. 333 (testifying that he had

18 - OPINION & ORDER

been clean for "three, four, five years").  He also testified that he had a medical marijuana card.  Tr. 331.  He said he smoked marijuana for medical purposes, but he did not have his medical marijuana card with him, and could not remember the doctor who originally prescribed it for him.  Tr. 331-32.  Plaintiff stated that he used marijuana because of severe pain, severe nausea, and his eating disorder.  Tr. 332.

In addition to the depression and back pain, plaintiff testified he was diagnosed with sleep apnea, for which he was prescribed a medication.  Tr. 320.  He did not name the medication. Tr. 321.  He also said he has other "disorders" including "bipolar conditions," panic attacks, and agoraphobia.  Tr. 320, 321.

At the time of the hearing, plaintiff stated he was homeless other than the fact that his mother let him stay on her property. Tr. 316-17.  He stays in a sixteen-foot camper on her property, which has no power, no water, and no facilities.  Id.  He described sleeping out in the open a lot, but conceded that this was his choice because he could sleep in the camper.  Tr. 318.  He often stays in bed all day in the camper.  Tr. 319, 323.  He reads a little bit, but mostly sleeps a lot and does "pretty much nothing." Tr. 323.

III.  Vocational Expert Testimony

Vocational Expert (VE) Vernon Arne testified at the hearing. The ALJ presented the VE with the following hypothetical: a forty-two year old individual with a GED and past work as performed by plaintiff, with no exertional limitations, but with the limitations of no public interaction, no complex tasks, and no hazardous work locations.  Tr. 340.  The ALJ responded that plaintiff could

19 - OPINION & ORDER

1    perform his past relevant work as a kitchen helper.  Tr. 342.

2    With an additional limitation of medium exertion, the VE
3    identified positions as a labeler.  Tr. 342-43.  When the
4    limitation was increased to sedentary, the VE identified the
5    positions of document preparer and eyeglass assembler.  Tr. 343.

6    In response to a question by plaintiff's counsel, the VE
7    stated that if the individual would be absent two to four days per
8    month because of combined effects of mainly psychological issues,
9    the individual would be unable to sustain competitive employment.
10    Tr. 345.

11                            THE ALJ'S DECISION

12    ALJ Kingery began her discussion of the claim by concluding
13    that because plaintiff had not appealed from the Appeals Council's
14    denial of plaintiff's request to review his claim filed on October
15    10, 2002, the prior ALJ's March 17, 2004 decision on that claim was
16    final and binding.  Tr. 18.  Next, after reciting the five steps of
17    the sequential analysis, the ALJ noted two additional concerns in
18    this case:  (1)  whether, if plaintiff is presumptively found
19    disabled, alcoholism or drug addiction is a contributing factor
20    material to a determination of disability; and (2) the application
21    of Chavez v. Bowen, 844 F.2d 691 (9th Cir. 1998) in light of the
22    fact that a previous ALJ decision had been issued in this case.
23    Tr. 20.

24    Next, in a section entitled "Earlier Administrative Law Judge
25    Findings," which appears before the section entitled "Findings of
26    Fact and Conclusions of Law," ALJ Kingery discusses and quotes
27    portions of the March 17, 2004 decision issued by ALJ Stewart.  Tr.
28    21.  First, ALJ Kingery noted that ALJ Stewart's decision found

20 - OPINION & ORDER

that no severe physical impairments were supported by the evidence of record, but that severe psychological impairments in the nature of a "'history of polysubstance abuse, a mood disorder variously described as marijuana induced, alcohol induced and possibly bipolar, a personality disorder with narcissistic, histrionic and borderline features, and possible malingering'" were reflected in the evidence of record. Id. (quoting ALJ Stewart's decision but no citation given).

Next, ALJ Kingery quoted four findings from ALJ Stewart's decision including that plaintiff's allegations were not totally credible and that plaintiff's past relevant work as a production worker, kitchen helper, forest products harvester, production line worker, and produce harvester did not require the performance of work-related activities precluded by his RFC. Id. Additionally, ALJ Kingery quoted ALJ Stewart's RFC:

> "The claimant has the following [RFC]: he has moderate limitations in understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, interacting appropriately with the public, tolerating close supervision, and independently formulating plans and goals. The claimant's substance abuse is a contributing material factor under Public Law 104-121."

Id. (quoting ALJ Stewart's decision but no citation given).

Next, ALJ Kingery quoted two long paragraphs from ALJ Stewart's decision supporting ALJ Stewart's determination that plaintiff was not fully credible. Tr. 21-22. ALJ Stewart cited several reasons in support of his negative credibility finding, including the following: (1) plaintiff repeatedly contradicted himself and outright lied about his past and present substance abuse histories such that his own statements and/or denials

21 - OPINION & ORDER

regarding his substance abuse, were "utterly unreliable"; (2) plaintiff's acknowledgment that his substance abuse likely contributed to his emotional difficulties but being unwilling to give up "his marijuana," which ALJ Stewart stated was known to be sedating and de-motivating; (3) plaintiff's failure to comply with prescribed medical treatment which the record showed produced a positive response and improvement in symptoms as to his mental conditions; and (4) Dr. Higgins-Lee's suspicion of malingering based on her extensive evaluation.[3]  Id.

Next, in the "Findings of Fact and Conclusions of Law" section, ALJ Kingery found that plaintiff had not engaged in substantial gainful activity since April 30, 2004, the most recent application date.  Tr. 22.  She further found that plaintiff has a severe combination of the follow impairments:  a personality disorder, a substance abuse disorder, and a drug-induced mood disorder.  Tr. 23.

In this portion of her opinion, ALJ Kingery noted that in his current Disability Report, plaintiff contended that his ability to work was limited by bipolar disorder, an anxiety disorder, depression, mental problems, agoraphobia, and spinal pain.  Id. She explained, however, that several medical practitioners that the claimant listed as having provided recent medical services to him, indicated that they did not have any recent records regarding plaintiff.  Id.  She noted that on June 29, 2004, claimant's own

---

[3]  ALJ Kingery did not explain whether she was giving these findings preclusive effect, or in what capacity she was reciting them.  Her decision lacks clarity on this issue.

representative confirmed to a DDS "staffer" that claimant had not sought any treatment since Judge Stewart's unfavorable March 17, 2004 decision. Id. (citing Tr. 217).

ALJ Kingery cited to an October 29, 2004 note made by Dr. Mary Ann Westfall, M.D., in a Development Summary Worksheet that based on her review of the evidence, although there was a record of an ear pain complaint, the most recent psychological examination noted that plaintiff did not complain of back pain. Id. (citing Tr. 232). ALJ Kingery noted Dr. Westfall's conclusion that plaintiff had no severe physical impairment. Id. Additionally, ALJ Kingery noted that on August 18, 2006, plaintiff told Dr. Vandiver that other than problems with his teeth, he was unaware of other health problems and "feels he is fairly physically healthy." Id. Based on this, ALJ Kingery concluded that plaintiff had not met his burden of demonstrating that he had a severe physical impairment. Id.

As to his mental impairments, ALJ Kingery noted that on July 14, 2004, DDS psychologist Dr. Rethinger found that plaintiff had psychological impairments of affective disorder (drug induced mood disorder), a personality disorder with narcissistic, histrionic, and borderline features, and polysubstance abuse. Id.

Next, she discussed Dr. Smolen's November 12, 2004 report including Dr. Smolen's diagnosis of polysubstance dependence with a strong suspicion of malingering. Id. ALJ Kingery then noted the limitations assessed by Dr. Smolen which were limited to mild impairments in the abilities to concentrate, remember, and understand, as well as Dr. Smolen's noting the possibility that plaintiff could relate to people if he wanted to. Id. ALJ Kingery

23 - OPINION & ORDER

then cited to DDS psychologist Dr. Henry's November 22, 2004 assessment where he concluded that plaintiff had severe impairments of an affective disorder (drug induced mood disorder), a personality disorder, and polysubstance dependence.   Tr. 23-24. ALJ Kingery gave greater weight to Dr. Henry's opinions regarding plaintiff's limitations which over Dr. Rethinger's which had a greater degree of limitation in some areas, because Dr. Henry "had a more complete record from which to draw his conclusions."[4]   Tr. 24.

ALJ Kingery noted plaintiff's report that he has an eating disorder and that he is dependent on medical marijuana to treat the disorder. Id. Then, she noted that Dr. Vandiver had never heard of the type of eating disorder plaintiff claimed to have. Id. Additionally, ALJ Kingery noted that given that plaintiff reported on August 22, 2006, that he had no regular doctor, the lack of evidence in the record that any physician or psychiatrist had actually prescribed medical marijuana, that claimant could not remember at the hearing which doctor had prescribed it for him, and that while on probation, plaintiff failed a urinalysis and was placed back in jail, his reporting that he was certified for marijuana use was questionable. Id. Thus, ALJ Kingery found that he had not met his burden of proving that he had an eating disorder. Id.

---

[4]   ALJ Kingery's decision would be more clear if she had expressly noted what made the record more complete for Dr. Henry. Presumably, it was the inclusion of Dr. Smolen's November 12, 2004 evaluation, because that is the only medical evidence in the record bearing a date between Dr. Rethinger's and Dr. Henry's assessments, and the ALJ had just cited to Dr. Smolen's evaluation before discussing Dr. Henry's assessment.

Next, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. Id. ALJ Kingery considered whether plaintiff met or equaled three different listed impairments: 12.04 (affective disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders). Id. She found that he did not establish the presence of the required "B" or "C" criteria. Tr. 24-25. She relied on Dr. Henry's assessment of plaintiff's limitations and noted that no treating or examining physician had mentioned findings equivalent in severity to the criteria of any listed impairment. Tr. 25. Then, in concluding this part of her decision, ALJ Kingery stated that

> [n]on-examining psychologist Rethinger had opined that the claimant did not meet any listing exclusive of substance abuse, but inclusive of substance abuse, would meet the "B" criteria with marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration/persistence/pace . . . . . However, the psychologist appeared to be relying exclusively on the prior ALJ decision, since there was no current medical evidence of record. Subsequent examination by mental health specialists, including evaluation by non-examining psychologist Henry, support the lesser restrictions noted by psychologist Henry. Disability at a listing level when including exacerbating substance abuse, therefore, is not established under 20 C.F.R. 416.920(d). These findings are consistent with the following assessment of residual functional capacity.

Id.[5] (citation omitted).

---

[5] Other than the first sentence, which is clear and accurate, much of this paragraph of ALJ Kingery's decision is a challenge to understand. The second sentence, "the psychologist appeared to be relying exclusively on the prior ALJ decision, since there was no current medical evidence of record" is unclear. There was, in fact, at the time of Dr. Rethinger's assessment, examining psychologist Dr. Balsamo's April 30, 2004 evaluation in the record. Thus, the basis for ALJ Kingery's statement is erroneous. Without that, her rationale for assuming

1    Following this paragraph, ALJ Kingery states that the
2    presumption of continuing nondisability under <u>Chavez</u> has been
3    rebutted by changed circumstances. <u>Id.</u> She further stated that
4    plaintiff has reported that his substance abuse has been in
5    sustained remissions and the overall evidence of record suggested
6    that "his limitations have concurrently been reduced." <u>Id.</u>

7    If I understand this correctly, ALJ Kingery found the
8    presumption of nondisability created by ALJ Stewart's prior
9    determination, rebutted by the fact that plaintiff was no longer
10   abusing drugs.  But, <u>Chavez</u> indicates that the presumption of
11   nondisability created by a prior determination must show changed
12   circumstances "indicating a greater disability." <u>Chavez</u>, 844 F.2d
13   at 693.  Plaintiff's sustained remission from drug abuse does not
14   appear to be a qualifying "changed circumstance" under <u>Chavez</u>
15   because it does not indicate a "greater disability."

16   Following her comments about plaintiff's drug use, ALJ Kingery
17   then assessed plaintiff's RFC as being able to perform a full range
18   of work at all exertional levels, but with limitations of no public

19   _____

20   what Dr. Rethinger relied on, is not supported.
21        There are two problems with the following sentence.  First,
     she states that "[s]ubsequent examination by mental health
22   specialists, including evaluation by non-examining psychologist
     Henry, . . . "  How can a non-examining practitioner be included
23   as one of the mental health specialists who <u>examined</u> a claimant?
     Second, she states, essentially, that subsequent examination by
24   specialists, including Henry, support Henry's lesser
     restrictions.  Relying on Henry's "examination" to support
25   Henry's restrictions is circular reasoning.
26        Finally, I do not understand what ALJ Kingery meant when she
     said that "[t]hese findings" are consistent with her following
27   RFC.  I do not understand which "findings" she refers to, and I
     do not understand how findings at step three are consistent with
28   a later developed RFC.

26 - OPINION & ORDER

interaction and no complex tasks.  <u>Id.</u>  She found that while plaintiff's impairments could reasonably be expected to produce some of his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible.  Tr. 26.

First, she determined that plaintiff's allegations were disproportionate to the objective findings in the medical record, including a lack of physical impairments accounting for his back or ear pain, and a lack of record by his practitioners of reports of panic attacks or agoraphobia.  ALJ Kingery noted the inconsistency between plaintiff's statements that he cannot or does not leave the trailer on his mother's property, and the report to Dr. Vandiver that he likes to go fishing a lot.  Tr. 26-27.

Next, ALJ Kingery rejected written submissions by plaintiff's mother describing plaintiff's symptoms and limitations because they were inconsistent with medical and other evidence.  Tr. 27.  ALJ Kingery found that the mother's statements that plaintiff was not an alcoholic, binge drinker, or ongoing substance abuser were contradicted by a December 1, 2006 report by Dr. Vandiver which noted that plaintiff's mother was concerned about plaintiff's drinking and suspected he was using "white dope."  <u>Id.</u>

ALJ Kingery then noted that plaintiff had sometimes been prescribed psychotropic medications, sometimes was noncompliant with his medications, and sometimes was not prescribed medications.  <u>Id.</u>  Counseling records indicated that counseling was generally nonproductive.  <u>Id.</u>  She found that based on this combination of factors, plaintiff's statements concerning his impairments and their impact on his ability to work were accepted only to the

27 - OPINION & ORDER

1   extent that they are consistent with the RFC she assessed. <u>Id.</u>

2      Based on the RFC, ALJ Kingery then found, based on Arne's

3 testimony, that plaintiff could perform his past relevant work as

4 a kitchen helper. Tr. 28. Alternatively, she found that if

5 plaintiff had no past relevant work or could not perform it, he

6 could still perform the jobs of labeler, document preparer, or

7 eyeglass assembler. Tr. 28-29. Thus, ALJ Kingery concluded that

8 plaintiff was not disabled. Tr. 29.

9               STANDARD OF REVIEW & SEQUENTIAL EVALUATION

10      A claimant is disabled if unable to "engage in any substantial

11 gainful activity by reason of any medically determinable physical

12 or mental impairment which . . . has lasted or can be expected to

13 last for a continuous period of not less than 12 months[.]"  42

14 U.S.C. § 423(d)(1)(A).  Disability claims are evaluated according

15 to a five-step procedure. <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1395

16 (9th Cir. 1991).  The claimant bears the burden of proving

17 disability. <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir.

18 1989).  First, the Commissioner determines whether a claimant is

19 engaged in "substantial gainful activity."  If so, the claimant is

20 not disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20

21 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner

22 determines whether the claimant has a "medically severe impairment

23 or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; <u>see</u>

24 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not

25 disabled.

26      In step three, the Commissioner determines whether the

27 impairment meets or equals "one of a number of listed impairments

28 that the [Commissioner] acknowledges are so severe as to preclude

28 - OPINION & ORDER

substantial gainful activity." Yuckert, 482 U.S. at 141; see 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, he is not disabled.  If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a mere scintilla," but "less than a preponderance." Id.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id.

DISCUSSION

Plaintiff contends that the ALJ made several errors:  (1) failing to fully develop the record; (2) failing to properly consider all medical evidence, including treating and examining doctors; (3) failing to make complete findings at step 2; (4) failing to consider certain impairments when considering the listed impairments at step 3; (5) formulating an incomplete RFC; and (6)

29 - OPINION & ORDER

formulating an incomplete hypothetical to the VE.

I.  Failure to Develop of the Record

In her opening memorandum, plaintiff notes that ALJ Kingery cited the previously unfavorable decision by ALJ Stewart, and commented on the res judicata effect of that unfavorable decision based on Chavez.[6]  Plaintiff notes that ALJ Kingery cited to a "sizable portion of [ALJ Stewart's] decision, presumably with approval." Pltf's Op. Mem. at p. 15.

Plaintiff complains that none of the record pertaining to the first decision was made part of the record in this case.  She contends that to comply with due process, defendant needed to produce the entire record compiled as part of the previous decision.  Plaintiff argues that the failure of the ALJ to ensure that all pertinent records were part of the file, and the failure of the Appeals Council to ensure that these records were made available for the appeal to this Court, violated the duty to fully and fairly develop the record.

In response to plaintiff's argument contained in plaintiff's opening memorandum, defendant obtained the complete record from the

_____

[6]  In a footnote, plaintiff notes that "[i]nterestingly, the ALJ later found that there were 'changed circumstances,' so that Chavez did not apply. . . .  However, it appears that she still gave res judicata effect to the prior ALJ's credibility findings." Pltf's Op. Mem. at p. 15 n.11.  Plaintiff's statement further exposes the confusion created by ALJ Kingery's decision. My reading of ALJ Kingery's decision indicates that after she determined there were changed circumstances, she made her own credibility findings and did not rely on those from the prior decision.  However, because she quoted from ALJ Stewart's discussion where he found plaintiff not credible, it is entirely unclear whether she found his credibility determination to be res judicata, or relied on her own credibility determination in reaching her conclusion.

30 - OPINION & ORDER

prior unfavorable determination and provided it to plaintiff.   I

allowed plaintiff time to review that record and file a

supplemental opening memorandum.   While it is not entirely clear

who should have provided the record to plaintiff or her counsel,

and when, any error is harmless because plaintiff has now had full

access to all the evidence cited and relied on by ALJ Kingery and

has had the opportunity to supplement her legal arguments here.

II.  Medical Evidence Errors

     Plaintiff argues that the ALJ erred by failing to even mention

the April 30, 2004 evaluation by Dr. Balsamo, and the information

contained in Dr. Dominy's September 17, 2004 letter.   Defendant

argues that the ALJ was not required to discuss Dr. Dominy's letter

because it was not probative or relevant evidence.   Defendant

further argues that the ALJ was not required to specifically

discuss Dr. Balsamo's opinion because her careful consideration of

the record was sufficient.

     For an ALJ

> [t]o reject an uncontradicted opinion of a treating or
> examining doctor, an ALJ must state clear and convincing
> reasons that are supported by substantial evidence. . .
> . If a treating or examining doctor's opinion is
> contradicted by another doctor's opinion, an ALJ may only
> reject it by providing specific and legitimate reasons
> that are supported by substantial evidence.

Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation

omitted).

     A.  Dr. Dominy

     Defendant argues that the ALJ did not err in failing to

specifically discuss Dr. Dominy's September 14, 2004 letter to the

Agency because in that letter, Dr. Dominy admits that she had not

seen plaintiff since February 2003, predating ALJ Stewart's

31 - OPINION & ORDER

decision by over one year.  Additionally, defendant notes that the record reflects that defendant's attempt to obtain updated medical records from Linn County Mental Health was met with a response indicating that there were no records for the period beginning June 2004 through October 2004.  Tr. 220-21.  Defendant also notes that a review of all of the records plaintiff has submitted from Linn County Mental Health indicates that Dr. Dominy saw plaintiff only one time, on May 23, 2001.  Tr. 612.

In Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984), the Ninth Circuit explained that while the Commissioner must "make fairly detailed findings in support of administrative decisions to permit courts to review those decisions intelligently," the Commissioner "need not discuss all evidence presented[.]"  Id.  The Commissioner must explain why "significant, probative evidence has been rejected," and must explain why uncontroverted medical evidence is rejected.  Id. at 1395.

Here, Dr. Dominy's opinion regarding plaintiff's mental status is controverted by other medical evidence in the record, including Dr. Vandiver's, Dr. Rethinger's, and Dr. Henry's reports. Additionally, because Dr. Dominy had not seen plaintiff for more than three years before writing the letter, and more importantly, had not seen him at all during the period under review, the evidence from Dr. Dominy was not significant or probative.  Under Vincent, the ALJ was not required to discuss Dr. Dominy's letter. Id. at 1395 (ALJ did not err in not mentioning letter by psychiatrist when it was controverted and offered an "after-the-fact" diagnosis).

/ / /

32 - OPINION & ORDER

B.  Dr. Balsamo

Defendant argues that ALJ Kingery "properly rejected Dr. Balsamo's opinion by preferring the opinions of Dr. Higgins-Lee, Gale Smolen, M.D., and Robert Henry, Ph.D." Deft's Mem. at p. 7. First, defendant notes that ALJ Kingery engaged in a "careful consideration of the entire record" and included a summary of evidence as well as her interpretation of the evidence.  Id. Defendant specifically refers to ALJ Kingery's "explicit[] endorse[ment] of Dr. Higgins-Lee's extensive evaluation in 2001, as well as Dr. Higgins-Lee's suspicion that plaintiff was malingering. Deft's Mem. at p. 8.  The problem with this argument, however, is that ALJ Kingery herself never discusses Dr. Higgins-Lee's evaluation.  Rather, ALJ Kingery's decision quotes portions of ALJ Stewart's opinion regarding Dr. Higgins-Lee's evaluation.

As discussed above in the section detailing the ALJ's decision, ALJ Kingery's citations to, and quotes from, ALJ Stewart's opinion is not at all clear.  ALJ Kingery makes no express statement that she finds any of ALJ Stewart's findings preclusive and controlling and, given that ALJ Kingery herself made a finding of Chavez changed circumstances and then did her own credibility analysis, it appears that she did not in fact find ALJ Stewart's findings binding in her own decision.  Simply quoting from ALJ Stewart's opinion discussing Dr. Higgins-Lee's evaluation is not a specific and legitimate basis for rejecting Dr. Balsamo's opinion.

Next, defendant argues that the "ALJ also properly gave more weight to the opinion[] of State agency psychologist, Dr. Henry, 'who had a more complete record from which to draw his

conclusions.'"   Id. (quoting ALJ Kingery decision at Tr. 24).
Here, the problem is that the ALJ's endorsement of Dr. Henry's
opinion because he had a "more complete record from which to draw
his conclusions" came in the context of her discussion of why she
adopted Dr. Henry's opinion over that of Dr. Rethinger.   Tr. 24.
This endorsement of Dr. Henry's opinion makes no mention of Dr.
Balsamo's opinion and offers no reason why she accepts the opinion
of non-examining Dr. Henry over examining Dr. Balsamo.

Third, defendant makes the same argument regarding Dr. Smolen.
Deft's Mem. at pp. 8-9.   That is, defendant argues that the ALJ
credited Dr. Smolen's opinion over Dr. Balsamo's as evidenced by
the ALJ's discussion of Dr. Smolen's November 12, 2004 evaluation.
Defendant spends an entire page discussing the contents of Dr.
Smolen's report in an effort to show why it is entitled to more
weight than Dr. Balsamo's report. Deft's Mem. at p. 9.   But, that
is precisely what ALJ Kingery should have done and did not do.
This type of analysis is ALJ Kingery's job, not defense counsel's
job.

ALJ Kingery mentions Dr. Smolen's report a single time in her
twelve-page decision.   Tr. 23.   She noted Dr. Smolen's assessment
of plaintiff's impairments, including the strong possibility of
malingering, and her assessment of plaintiff's limitations.   Id.
There is no discussion whatsoever of why Dr. Smolen's report is to
be credited over that of Dr. Balsamo.

The ALJ, although entitled to disagree with Dr. Balsamo's
report and to reject it for specific, legitimate reasons in the
record, is not entitled to simply disregard it.   Unlike Dr.
Dominy's letter, Dr. Balsamo's evaluation of plaintiff occurred

34 - OPINION & ORDER

1  during the alleged disability period under review and thus, it is

2  relevant and probative.   Because it is probative, the ALJ must

3  offer specific and legitimate reasons to reject it.   While there

4  may be specific and legitimate reasons supported by substantial

5  evidence in the record to support a rejection of Dr. Balsamo's

6  opinion, it is the ALJ who must engage in this discussion, not

7  defense counsel, and not this Court.   It was error for ALJ Kingery

8  to ignore Dr. Balsamo's report.   Flores v. Shalala, 49 F.3d 562,

9  571 (9th Cir. 1995) (Secretary may not reject significant probative

10 evidence without explanation).

11 III.  Errors at Step Two and Step Three

12        Plaintiff argues that the ALJ erred at steps two and three of

13 the sequential analysis because she failed to consider any of Dr.

14 Balsamo's evaluation, or the information in Dr. Dominy's letter, in

15 determining plaintiff's severe impairments and the listings.   For

16 the reasons explained above, there is no error regarding Dr.

17 Dominy's letter.

18        Step two of the five-step sequential analysis "consists of

19 determining whether a claimant has a 'medically severe impairment

20 or combination of impairments.'"   Vasquez v. Astrue, 572 F.3d 586,

21 594 (9th Cir. 2009) (quoting Yuckert, 482 U.S. at 140-41).   A

22 severe impairment is one that limits a plaintiff's ability to

23 perform basic work activities.   20 C.F.R. §§ 404.1520(c),

24 416.920(c).  "An impairment . . . may be found not severe only if

25 the evidence establishes a slight abnormality that has no more than

26 a minimal effect on an individual's ability to work."   Webb v.

27 Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (internal quotation

28 omitted).   "Step two, then, is a de minimis screening device used

35 - OPINION & ORDER

1   to dispose of groundless claims[.]"  Id. (internal quotation and

2   brackets omitted).

3       Plaintiff argues that ALJ Kingery's step two evaluation, in

4   which she found that plaintiff had the combined severe impairments

5   of a personalty disorder, a substance abuse disorder, and a drug-

6   induced mood disorder, is incomplete because, having completely

7   ignored Dr. Balsamo's report, she failed to include his assessed

8   impairments of Bi-polar II Disorder and Cognitive Disorder NOS, and

9   failed to mention his opinion that plaintiff would likely never be

10  able to maintain gainful employment and may pose a danger to others

11  in a structured work setting.  I agree that the ALJ's error in not

12  mentioning Dr. Balsamo's report at any time in her opinion, is an

13  error at step two.

14      A step two error may be harmless if the ALJ accounts for the

15  impairment later in the sequential evaluation process.  Lewis v.

16  Astrue, 498 F.3d 909, 911 (9th Cir 2007) (step two error harmless

17  because ALJ considered limitations at step four).  ALJ Kingery

18  discussed plaintiff's bipolar disorder in her opinion.  Tr. 26.

19  She noted that at the hearing, when plaintiff testified that he had

20  panic attacks, agoraphobia, sleep apnea, and bipolar disorder, she

21  pointed out to plaintiff that the "file evidence does not support

22  many of these diagnoses."  Tr. 26.  She further noted that in

23  response, plaintiff stated that eight years previously, a doctor

24  had told him he had bipolar disorder.  Tr. 26.  ALJ Kingery also

25  noted that while plaintiff was invited to submit medical records

26  after the hearing to support these claims, he did not.  While not

27  exceptionally well-articulated,  I  understand  ALJ  Kingery's

28  discussion  here  to  be  a  rejection  of  plaintiff's  testimony

36 - OPINION & ORDER

regarding these alleged impairments because of a lack of supporting medical evidence.

Because ALJ Kingery rejected plaintiff's testimony regarding his bipolar disorder, it could be argued that her failure to discuss Dr. Balsamo's assessed impairments in her step two analysis was harmless error.   That is, if the ALJ subsequently properly found that bipolar disorder was not an impairment, there is no harm arising from her failure to discuss it at step two.   The problem, however, is that in this case, the ALJ rejected plaintiff's testimony regarding bipolar disorder because, she said, there was no "file evidence" to support his testimony.   But, Dr. Balsamo's report, which was in "the file" concludes that plaintiff suffers from "Bi-polar Disorder II."   While there may be legitimate reasons to disregard that opinion, the ALJ did not offer any in her decision.   Therefore, I cannot say that her step two error was harmless.

Additionally, the ALJ's RFC does not appear to include any limitations ascribable to Dr. Balsamo's assessed impairments of bipolar disorder or a cognitive disorder.   Although ALJ Kingery did limit plaintiff to no public interaction and to no complex skills, there is no discussion in her opinion that these limitations relate to bipolar disorder or cognitive impairments and thus, I cannot say that the step two error is harmless.

At step three, the ALJ determines whether a claimant's impairment meets or equals "one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141.   While ALJ Kingery discussed several possible listed impairments for

37 - OPINION & ORDER

1  mental disorders, plaintiff argues that the ALJ's failure to

2  discuss Dr. Balsamo's opinion created the additional error of

3  failing to find plaintiff disabled under Listed Impairment 12.05C,

4  one not mentioned by the ALJ.

5      Listed Impairment 12.05 addresses mental retardation.  As

6  explained in the regulation:

> Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in
> adaptive functioning initially manifested during the
> developmental period; i.e., the evidence demonstrates or
> supports onset of the impairment before age 22.

10 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The regulation then sets

11 forth four separate ways to establish the required severity,

12 including "C," relied on by plaintiff, which provides:  "A valid

13 verbal, performance, or full scale IQ of 60 through 70 and a

14 physical or other mental impairment imposing an additional and

15 significant work-related limitation of function[.]"  Id.

16     Plaintiff argues that because Dr. Balsamo tested plaintiff's

17 full scale IQ at 66, the ALJ, had she discussed Dr. Balsamo's

18 report, should have found that plaintiff met the requirements for

19 Listed Impairment 12.05C.  Defendant notes that plaintiff never

20 mentioned mental retardation as a disabling condition in the

21 disability report filed with the current SSI application.  Tr. 106.

22 More importantly, defendant argues that there is no evidence in the

23 record to show that plaintiff's mental retardation, if any, was

24 apparent before age 22.

25     To qualify as presumptively disabled under § 12.05, the

26 claimant must "satisf[y] the diagnostic description in the

27 introductory paragraph [§ 12.05] and any one of the four sets of

28 criteria [outlined in paragraphs A, B, C, or D]." 20 C.F.R. Pt.

404, Subpt. P, App. 1, § 12.00(A) (noting that § 12.05 is an exception to the general rule of applying the "paragraph B criteria" to claims of mental disorder under § 12.00). Thus, it is not enough to show that at the time Dr. Balsamo evaluated plaintiff, he may have had a full scale IQ of 66. Here, any error by the ALJ in failing to discuss Dr. Balsamo's opinion in evaluating whether plaintiff met the requirements for Listed Impairment 12.05C, is harmless because even if Dr. Balsamo's opinion is credited as true, it does not establish any cognitive impairment for any time period other than the time of evaluation, when plaintiff was thirty-nine years old.

IV.   RFC & VE Hypothetical

Plaintiff contends that ALJ Kingery erred by failing to include limitations assessed by Dr. Rethinger into the RFC. Plaintiff argues that while ALJ Kingery rejected the portion of Dr. Rethinger's opinion suggesting that plaintiff was disabled, with DA&A material to that disability, Tr. 25, she never addressed certain limitations.

Specifically, plaintiff points to Dr. Rethinger's July 14, 2004 mental RFC evaluation finding plaintiff moderately limited in his ability to sustain an ordinary routine without special supervision, and in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 198-99.

Additionally, plaintiff points to Dr. Rethinger's assessment in his July 14, 2004 PRTF, that even exclusive of his DA&A, plaintiff was moderately limited in maintaining concentration, persistence, and pace. Tr. 212. As to this particular limitation,

39 - OPINION & ORDER

plaintiff argues that the ALJ's restriction to work that is not "complex," does not adequately account for this limitation.

While the ALJ did not specifically refer to Dr. Rethinger's limitations in the abilities to sustain an ordinary routine and to get along with coworkers or peers, she did discuss several other of Dr. Rethinger's limitations and specifically stated that she rejected them in favor of those assessed by Dr. Henry because Dr. Henry had a more complete record from which to draw his conclusions.  This is a specific, legitimate basis, supported by substantial evidence in the record, upon which to credit Dr. Henry's assessment over Dr. Rethinger's assessment.  There was no need for the ALJ to mention every one of the functional assessments rendered by Dr. Rethinger when she adequately supported her decision that Dr. Henry's subsequent mental RFC and limitations noted in the PRTF, were entitled to more weight.  The ALJ did not err in this regard.  Additionally, given her rejection of Dr. Rethinger's report, the ALJ was not obligated to include his concentration, persistence, and pace limitation in her RFC.

Nonetheless, given the ALJ's failure to discuss Dr. Balsamo's report, the RFC and the hypothetical presented to the VE may well be incomplete.  Thus, upon remand, the ALJ must determine what weight, if any, to give to Dr. Balsamo's report, and not only consider it at step two, but also in determining plaintiff's RFC, which forms the basis of the hypothetical to the VE.  The ALJ may credit the opinion of a non-examining practitioner like Dr. Henry, over an examining practitioner like Dr. Balsamo, only by giving "specific and legitimate reasons that are supported by substantial evidence in the record."  Moore v. Commissioner, 278 F.3d 920, 924

40 - OPINION & ORDER

(9th Cir. 2002) (ALJ may reject an opinion of an examining
physician, if contradicted by a non-examining physician, as long as
the ALJ gives specific and legitimate reasons supported by
substantial evidence).

V.  Remand

Plaintiff argues that this case should be remanded for a
determination of benefits.  The decision whether to remand for
further proceedings or for immediate payment of benefits is within
the discretion of the court.  Harman v. Apfel, 211 F.3d 1172, 1178
(9th Cir. 2000).  The issue turns on the utility of further
proceedings.  A remand for an award of benefits is appropriate when
no useful purpose would be served by further administrative
proceedings or when the record has been fully developed and the
evidence is insufficient to support the Commissioner's decision.
Rodriguez v. Bowen, 876 F.2d 759, 763 (9th Cir. 1989).

Under the "crediting as true" doctrine, evidence should be
credited and an immediate award of benefits directed where "'(1)
the ALJ has failed to provide legally sufficient reasons for
rejecting such evidence, (2) there are no outstanding issues that
must be resolved before a determination of disability can be made,
and (3) it is clear from the record that the ALJ would be required
to find the claimant disabled were such evidence credited.'"
Harman, 211 F.3d at 1178 (quoting Smolen v. Chater, 80 F.3d 1273,
1292 (9th Cir. 1996)).  The "crediting as true" doctrine is not a
mandatory rule in the Ninth Circuit, but leaves the court
flexibility in determining whether to enter an award of benefits
upon reversing the Commissioner's decision.  Connett v. Barnhart,
340 F.3d 871, 876 (9th Cir. 2003) (citing Dodrill v. Shalala, 12

41 - OPINION & ORDER

F.3d 915, 919 (9th Cir. 1993)); <u>Nguyen v. Chater</u>, 100 F.3d 1462,
1466-67 (9th Cir. 1996); <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 348
(9th Cir. 1991).

I do not find remanding for an award of benefits appropriate
in a case such as this where the ALJ failed to even consider an
examining physician's report.  The ALJ is the factfinder and the
appropriate adjudicator to sift through and weigh all of the
evidence of record in the first instance.  Additionally, in this
case, the ALJ's opinion needs clarification.  It remains unclear if
she gave res judicata effect to ALJ Stewart's prior findings.  It
is also unclear how the ALJ applied <u>Chavez</u> given that the changed
circumstance she noted was not indicative of greater disability.
This should be further addressed upon remand.

CONCLUSION

The Commissioner's decision is reversed and the case is
remanded for additional proceedings.


Dated this __30th__ day of _September_ , 2010.


                                        /s/ Dennis J. Hubel

_____
                                        Dennis James Hubel
                                        United States Magistrate Judge


42 - OPINION & ORDER